[No. 41403-1-II.   Division Two.   October 16, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. ADALBERTO JIMINEZ MACIAS, *Appellant*.

324

*Eric J. Nielsen* and *Andrew P. Zinner* (of *Nielsen, Broman & Koch PLLC*), for appellant.

*Susan I. Baur, Prosecuting Attorney*, and *David Phelan, Deputy*, for respondent.

¶1 VAN DEREN, J. — Adalberto Jiminez Macias appeals from his convictions on four counts of delivery of a controlled substance, cocaine, with one count subject to a school bus route stop enhancement; one count of unlawful possession of a controlled substance, cocaine, with intent to deliver; and one count of unlawful possession of a controlled substance, methamphetamine. He argues (1) the trial court

erred in giving the *Castle*[1] reasonable doubt instruction expressly disapproved of by our Supreme Court in *State v. Bennett*, 161 Wn.2d 303, 165 P.3d 1241 (2007), requiring reversal and remand for a new trial; (2) his counsel was ineffective because he failed to object to the *Castle* instruction; (3) probable cause did not support a search warrant, requiring suppression of evidence and reversal of two of his convictions; and (4) sufficient evidence does not support two of his convictions. We affirm.

## FACTS

PROBABLE CAUSE AFFIDAVIT AND SEARCH WARRANT

¶2 In 2009, the Cowlitz-Wahkiakum Narcotics Task Force investigated a drug trafficking organization (DTO) responsible for cocaine and methamphetamine distribution. The investigation culminated in the execution of a search warrant and Macias's arrest and conviction. According to the affidavit supporting the search warrant, a DTO is "an organization of five or more persons that engage[s] in importation, production, transportation, distribution, trafficking[,] and money laundering activities [related to illegal drugs]." Clerk's Papers (CP) at 59. DTOs "generally involve a continuing enterprise, a core organization, [and] a specific entity with a distinct hierarchy and administrative functional structure." CP at 59.

### A. DTO Members and Controlled Buys

¶3 Over the course of the investigation, the task force, with the assistance of three confidential informants (CI1, CI2, and CI3), identified several known DTO members: Ignacio Tovar-Arechiga, also known as "Nacho"; Ricardo Carbajal-Santiago, also known as "Ricardo"; Jesus Mejia-Rosas, also known as "Alex"; J. Angel Orozco; Jose Luis Ramirez; and Macias. According to CI2, who was familiar

---

[1] *State v. Castle*, 86 Wn. App. 48, 935 P.2d 656 (1997).

with the DTO and had gained a "position of trust" with its members, Nacho was a major dealer who supplied Macias with cocaine and methamphetamine that Ricardo sometimes delivered. CP at 60. CI2 also identified Macias as a "large quantity dealer of cocaine and methamphetamine" who supplied Alex, Ricardo, and "others" with those drugs. CP at 73. The task force used its confidential informants to conduct a series of controlled drug purchases[2] from the DTO members.

¶4 From April through June 2009, CI3 participated in eight controlled cocaine drug buys from Alex. In all but three of the eight buys, Alex drove a silver Honda Accord then registered to him, picked up CI3, and conducted the drug transaction in the car. During one purchase, CI3 observed a white Chevrolet Tahoe registered to Macias parked at Alex's residence at 1016 South 11th Avenue, apartment 6. During the eighth and final purchase, Alex drove a white Honda Accord to the drug transaction meeting place. Shortly after this eighth purchase, law enforcement began observing Macias driving the same silver Honda Accord that Alex had driven in five of the eight buys, and parking it at his residence, 65 Alpha Drive, apartment 24; and at another address, 3903 Ocean Beach Highway, apartment J4. Shortly after Macias began driving the silver Accord, its plates and registration were changed from Alex to Ramirez, and the registration showed the Ocean Beach Highway, apartment J4, address as Ramirez's residence.

¶5 On June 3, CI1 called Ricardo and arranged a controlled purchase of an "[eight]-ball"[3] of cocaine. CP at 68. Law enforcement observed CI1 enter Ricardo's residence. According to CI1, he gave Ricardo the prerecorded money,

---

[2] In a controlled drug purchase, law enforcement searches the confidential informant before the transaction and after the informant returns with the purchased drugs to verify the informant possesses no other drugs, money, or contraband. The informant uses prerecorded money provided by the task force to purchase the drugs.

[3] An "eight-ball" is one eighth of an ounce of cocaine. Report of Proceedings at 82.

and Ricardo called someone and requested an eight-ball. Some minutes later, Ricardo left his apartment and Macias arrived in his maroon Honda Accord. Macias entered Ricardo's apartment and handed a baggy of cocaine to Ricardo's roommate, who gave the baggy to CI1.

¶6 On June 4, June 5, June 9, and June 19, CI1 called Macias and arranged controlled cocaine buys; and Macias picked up CI1 in various vehicles and conducted the transactions in the vehicles. On June 4, Macias drove the maroon Accord to meet with CI1. On June 5, he drove a silver Jeep Cherokee that law enforcement officers had observed on several occasions parked at his Alpha Drive residence. He also told CI1 that he had methamphetamine for sale. On June 9, Macias drove the silver Honda Accord registered to Ramirez, which law enforcement subsequently followed to Alex's residence, where Macias's white Chevrolet Tahoe was parked. Finally, on June 19, Macias drove the silver Honda Accord registered to Ramirez with Ramirez as a passenger.

### B. 3903 Ocean Beach Highway, Apartment J4

¶7 In early June 2009, CI2 overheard a conversation about Macias's plan to purchase one half kilogram of cocaine from Nacho. Ricardo later delivered the cocaine. On July 2, CI2 stated that within the past 48 hours he[4] had observed approximately four ounces of cocaine at 3903 Ocean Beach Highway, apartment J4. Also on July 2, CI2 observed Alex and Ramirez purchasing methamphetamine from Orozco at Orozco's residence; CI2 identified Orozco as a "pound level methamphetamine dealer." CP at 73. On July 8, law enforcement officers observed Ramirez entering 3903 Ocean Beach Highway, apartment J4, through the front door with a key and saw Macias's white Tahoe in the apartments' parking lot. Later that day, law enforcement followed Macias's Tahoe to a restaurant used for laundering the DTO's drug sale profits, then back to 3903 Ocean Beach

---

[4] CI2's gender is not revealed by the record. We refer to CI2 as a male for clarity.

Highway, where Macias exited the Tahoe and entered apartment J4 through the front door using a key. On July 16, law enforcement first observed Macias's maroon Accord parked at 3903 Ocean Beach Highway and then later the same day observed it at his Alpha Drive residence, where his white Tahoe and silver Cherokee also were parked.

¶8 On July 23, based on these facts, law enforcement successfully requested a warrant to search 3903 Ocean Beach Highway, apartment J4, for evidence of an ongoing conspiracy to distribute cocaine and methamphetamine, including drugs and related items—such as records of drug transactions, paraphernalia of drug distribution or use, and evidence of other DTO members' identities.[5] On July 30, Ramirez, who was the apartment's lessee, answered the door when law enforcement executed the warrant.

¶9 The apartment had two bedrooms. Inside the first bedroom closet, law enforcement officers discovered a backpack containing a brick of a white, powdery substance that later tested positive as cocaine and three plastic baggies containing a white, powdery substance. A number of pocketed shirts hung in the closet; in one pocket, officers discovered a baggy containing a crystalline substance that later testified positive as methamphetamine. Officers also discovered an electronic scale with a white, powdery residue on a shelf above the closet clothes rack.

¶10 The first bedroom also contained a dresser. In one of its drawers, officers discovered another electronic scale with traces of a white, powdery substance. Officers photographed[6] the items inside or around the dresser and bedroom, including a children's book belonging to one of Macias's daughters; Macias's Social Security card; a pay stub belonging to Macias's wife, Anabell Gonzales, ad-

---

[5] The affidavit for the search warrant that Macias challenges was for numerous places, vehicles, and people believed related to the DTO and is 24 pages long. We address only those portions relevant to apartment J4 and Macias's challenges.

[6] These photographs were admitted as exhibits 20 and 21 at trial.

dressed to the Alpha Drive residence; Gonzales's birth certificate; a video game console system belonging to one of Macias's daughters; soccer socks belonging to one of Macias's daughters; and title documents naming Macias as the registered owner of the maroon Accord at the Alpha Drive address.

¶11 In a linen closet between the two bedrooms, officers discovered receipts for international money transfers. Two receipts were for transfers from Macias to a woman in Mexico in the amounts of $500 and $1,000. The other receipt was a transfer from Ramirez to another woman in Mexico for $2,500. In either the kitchen or living room, officers discovered a cable television bill addressed to Ramirez at 3903 Ocean Beach Highway, apartment J4.

TRIAL AND CONVICTION

¶12 The State charged Macias with delivery of cocaine based on the June 3 controlled buy (count I); delivery of cocaine with a school bus route stop enhancement based on the June 4 controlled buy (count II); delivery of cocaine based on the June 5 controlled buy (count III); delivery of cocaine based on the June 9 controlled buy (count IV); delivery of cocaine based on the June 19 controlled buy (count V); and unlawful possession of cocaine with intent to deliver and unlawful possession of methamphetamine based on the July 30 search (counts VI and VII).

¶13 Before trial, Macias argued that the search warrant affidavit did not establish probable cause and unsuccessfully moved to suppress the evidence seized during the July 30 search of 3903 Ocean Beach Highway, apartment J4. At trial, several law enforcement officers and CI1 testified consistently with the affidavit's descriptions of CI1's controlled drug buys from Macias. Gonzales testified that the photo exhibits 20 and 21 were taken in Macias's residence, not in 3903 Ocean Beach Highway, apartment J4.

¶14 The jury found Macias guilty of all charges except count V, the June 19 controlled buy. He appeals.

## ANALYSIS

ERRONEOUS REASONABLE DOUBT INSTRUCTION

¶15 The trial court gave the following jury instruction on reasonable doubt, which instruction is referred to as the *Castle* instruction:

> The defendant has entered pleas of not guilty. This plea put in issue every element of the crimes charged. The State is the plaintiff and has the burden of proving each element of the crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists.
>
> A defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt.
>
> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him or her guilty. If on the other hand, you think there is a real possibility that he or she is not guilty, you must give him the benefit of the doubt and find him not guilty.

CP at 138.

¶16 Macias did not object to this instruction at trial. Thus, he argues for the first time on appeal that the trial court erred in giving the *Castle* reasonable doubt jury instruction, based on our Supreme Court's disapproval of such an instruction in *Bennett,* requiring reversal and remand for a new trial. The State responds that Macias failed to preserve this issue by not objecting at trial because the error is not of constitutional magnitude. We agree with the State.

A. Standard of Review

¶17 RAP 2.5(a) generally does not allow parties to raise claims for the first time on appeal. *State v. Robinson*, 171 Wn.2d 292, 304, 253 P.3d 84 (2011). But RAP 2.5(a)(3) allows appellants to raise claims for the first time on appeal if such claims constitute manifest error affecting a constitutional right. To determine whether an error is truly of constitutional dimension, appellate courts first look to the asserted claim and, if the claim is correct, assess whether it implicates a constitutional interest. *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009).

B. No Constitutional Error

¶18 In *Bennett*, our Supreme Court expressly disapproved of the same *Castle* instruction the trial court gave here. 161 Wn.2d at 309, 317-18. The *Bennett* court used its inherent supervisory power to unambiguously direct trial courts to use only the reasonable doubt instruction provided in Washington Pattern Jury Instruction 4.01, "until a better instruction is approved." 161 Wn.2d at 318 (citing 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.01 (3d ed. 2008) (WPIC). Nonetheless, it concluded that "the *Castle* instruction satisfies the constitutional requirements of the due process clause of the United States Constitution" and that the *Castle* instruction "is constitutionally adequate." *Bennett*, 161 Wn.2d at 315.

¶19 *Bennett* makes clear that the trial court erred in giving the *Castle* reasonable doubt instruction instead of WPIC 4.01. *State v. Lundy*, 162 Wn. App. 865, 871, 256 P.3d 466 (2011). In *Lundy*, we addressed whether a *Castle* instructional error raised for the first time on appeal was harmless under the constitutional harmless error standard. 162 Wn. App. at 870, 872. We did not first consider whether such an error is of constitutional magnitude. We do so now. Again, as *Bennett* makes clear, it is not. 161 Wn.2d at 315.

¶20 Macias nonetheless argues that holding that he failed to preserve the issue would undermine our Supreme

Court's inherent supervisory power and render our Supreme Court's exercise of such power "unenforceable and illusory." Br. of Appellant at 16-17. We disagree.

¶21 Our Supreme Court exercised its supervisory powers to inform trial courts that they err when they do not instruct juries on reasonable doubt using WPIC 4.01. But issue preservation rules also require parties to inform the trial court of its errors. *See Robinson*, 171 Wn.2d at 304. By doing so, issue preservation rules "encourage 'the efficient use of judicial resources' . . . by ensuring that the trial court has the opportunity to correct any errors, thereby avoiding unnecessary appeals." *Robinson*, 171 Wn.2d at 304-05 (quoting *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988)). Macias cites no authority supporting a conclusion that our Supreme Court has carved out an issue preservation exception for *Castle* instructional errors. *See Robinson*, 171 Wn.2d at 305 (recognizing an exception for retroactive new constitutional interpretations). Accordingly, we hold that he may not raise this issue for the first time on appeal.[7]

¶22 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

WORSWICK, C.J., and HUNT, J., concur.

---

[7] If we were to reach the merits of Macias's claim, we would hold that any instructional error was harmless. Under the nonconstitutional harmless error standard, reversal is required only if there is a reasonable probability that error materially affected the trial's outcome. *State v. Ray*, 116 Wn.2d 531, 546, 806 P.2d 1220 (1991). See our discussion in the unpublished portion of this opinion under Macias's challenge for ineffective assistance of counsel.